614 So.2d 377 (1992)
LAUDERDALE COUNTY DEPARTMENT OF HUMAN SERVICES, By Clayton R. BARNETT, Social Services Area Director and A.M.G., a Minor, By and Through Her Next Friend, Clayton R. Barnett
v.
T.H.G. and L.D.G.
No. 90-CA-0713.
Supreme Court of Mississippi.
December 31, 1992.
Concurring Opinion March 18, 1993.
Michael C. Moore, Atty. Gen., Kay Hardage, Sp. Asst. Atty. Gen., Jackson, John L. Prichard, Deen Cameron & Prichard, Meridian, for appellants.
Leslie C. Gates, Meridian, for appellee.
Shirley Payne, Horn & Payne, Jackson, for amicus curiae.
Before ROY NOBLE LEE., C.J., HAWKINS, P.J., and McRAE, J.
McRAE, Justice, for the Court:
In this appeal from the Chancery Court of Lauderdale County, we consider the very narrow question of whether, in a termination of parental rights proceeding based on the mental illness of both natural parents, otherwise privileged medical and psychiatric information concerning the parents should be admissible, thus waiving any privilege. While we decline to create an exception to the evidentiary rule, Miss. R.Evid. 503, the psychiatrist/psychologistpatient privilege, we find that other evidence, lay testimony or Miss.R.Evid. 706, which allows the court to appoint expert witnesses on its own motion or by motion of the parties, afford the chancellor an opportunity to consider evidence which will be helpful to the trier of fact without infringing upon the rights of the parents. *378 Accordingly, we remand for further proceedings consistent with this opinion.

FACTS

A.
The facts of this case tell the sad story of a little girl born to parents who long have battled serious and debilitating mental illnesses. A.M.G. was removed from her parents' home when she was six months old and placed with foster parents who now wish to adopt her. Several months later, upon the direction of the Youth Court, the Lauderdale County Department of Human Services initiated termination of parental rights proceedings pursuant to Miss. Code Ann. § 93-15-103(3)(d)(i) (Supp. 1992), which provides for termination when a parent "exhibits ongoing behavior" such as mental illness, which is unlikely to change over time and makes the parent unable to provide acceptable care for the child.

A.M.G.
A.M.G. was born on November 17, 1987, to Lloyd and Tina G. Because of her parents' long and well-documented histories of mental illness, her progress was monitored by the Lauderdale County Department of Human Services (hereinafter "Human Services") as well as by the Lauderdale County Health Department (hereinafter "Health Department"). On April 5, 1988, Leslie Sanders, a registered nurse at the Health Department, notified Human Services of a possible problem with the child's parents. On that date, Tina had taken A.M.G. to the Health Department's pediatric clinic for a checkup. While in the waiting room, the baby was crying and screaming to the point of upsetting other patients, and her mother did nothing to console her. She stopped crying as soon as the nurse picked her up and cuddled her. Dr. Cherry Clark, the examining physician, testified that when asked why the baby was screaming,
[Tina] went into this delusional explanation about the Bible says that the left hand should not know what the right hand is doing and that some people out in the waiting room had different jewelry, silver and gold, and when the silver and the gold crossed, it was causing electrical shock to the baby.
Dr. Clark further testified that:
they believed the baby also had specific powers, that one of the notes that I have recorded at the time was that the baby was able to see much better with her eyes closed than with them open, and the baby had special powers and one other thing that had me concerned was that they believed that the baby's cereal was stunting her growth.
Examination of the child revealed a continuing "failure to thrive" or "inadequate weight gain," which had been documented by nurses at the clinic. Dr. Clark testified that she believed the parents were making every effort to feed the baby, but that it was "more emotional neglect and abuse I was worried about and stability and the formula mixing, the feeding, the weight gain, the emotional comforting of the child and the delusions that were in play at the time had me very concerned." She recommended making a referral to Human Services for daily visits to monitor the home environment and to supervise the baby's care.
Immediately after receiving the call from the Health Department, Human Services obtained a custody order from the Youth Court and removed A.M.G. from her parents' home. She was placed in a foster home, where the record indicates she quickly flourished.
Vicky Whitlock, the Lauderdale County Social Services worker assigned to the case, testified that Human Services had made no effort to return A.M.G. to her parents nor offered them parenting skills classes. She had made only brief home visits to the parents to schedule visits with A.M.G. Further examination by the court adduced testimony that at the time the petition was filed, Human Services had spoken only with Lloyd's father, Tina's mother, and the couple's minister to determine their fitness as parents.
Human Services did provide the parents with the opportunity to have supervised *379 visits with A.M.G. The record indicates that there were nine such visits between April 13, 1988, and November 15, 1989. These visits were unhappy experiences for both A.M.G. and her parents. Miss Whitlock testified on direct examination that:
The last visit was very much like the previous visits. It seems though that as [A.M.G.] has grown older or as she has grown, the visits have been more and more upsetting for her. At the last visit, the foster parents had brought her and left her at our office before the [parents] arrived. She was very content, very happy, chattered with me, played with others in the office, took a candy or sucker from people, and was very happy. The instant that she seen [sic] her parents, she became very tense, she clung to me, she first started to whimper and then cried. She cried uncontrollably, buried her head in my shoulder. At points, I had to take her from the room just to try to calm her down. She turns red and breaks out in splotches or hives all over and it is just very, very  she is just very upset and this was not just on the last visit, but that's the way all the visits have been. They have become worse.
Consequently, a hearing was held in Youth Court and on January 18, 1990, Judge Coleman temporarily stopped visitations pending further orders by the court.

B.
Lloyd and Tina have each suffered from chronic mental illness since their late teens. Lloyd has been consistently diagnosed as schizophrenic-paranoid type. Tina has been variously diagnosed as schizophrenic-schizo-affective type, schizophrenic-paranoid type and more recently, as "exhibiting more of the bi-polar cycles of affect disorder with intermittent psychotic features rather than a classic schizophrenic disorder" and a paranoid personality disorder. Both have spent most of their adult lives under both in-patient and out-patient psychiatric care, requiring extensive hospital stays following a variety of sometimes bizarre and dramatic psychotic episodes. Both require constant medication to maintain functional normalcy. The medication has serious side effects and deviation from the prescribed dosages or failure to take the medication for a prolonged period can trigger a psychotic episode.

Lloyd
Lloyd's family first recognized that he suffered from some form of mental illness in January, 1977 when he returned to Mississippi from Texas after the break-up of his first marriage. His father, James, testified that "he was out of control" and hearing voices. He was admitted to the Mississippi State Hospital at Whitfield following the theft and crashes of several small airplanes. He was apparently attempting to travel to Plains, Georgia to rescue Jimmy Carter from an imagined assassination attempt. He remained at Whitfield between March 11 and November 16, 1978.
In September of 1979, Lloyd's father committed him to the Veteran's Administration Hospital in Jackson after he shot and killed his prize Hereford cow upon direction from God. He was hospitalized for approximately three months. After he made little progress at the V.A. Hospital, his father had him admitted to the East Mississippi State Hospital (hereinafter "EMSH") for evaluation and treatment in 1980. Lloyd's father testified that he also committed him to the V.A. Hospital in Gulfport during this time period; however Lloyd testified that he spent some eighteen months in the V.A. facility in Biloxi in 1979. There is also an oblique reference to a suicide attempt in 1982.
In September 1983, Lloyd's father again took action to have Lloyd committed to EMSH because he "was hallucinating and hearing voices, and specifically, he was off his medication at that time." The diagnosing psychiatrist noted:
The patient does show thought disorder, he had threatened his family, he heard people telling him to kill his family, sharpen his axe and knives and that is why he was sent here. His father tries to protect him and I guess the best thing he could do was send him here.
*380 It was during this stay at EMSH that Lloyd and Tina met. Lloyd was also hospitalized in 1983 at Meridian Regional Hospital (now Laurel Wood) on the recommendation of his out-patient psychiatrist at the Weems Community Mental Health Center.
On July 30, 1985, Lloyd was again admitted to Meridian Regional Hospital after calling his father for help because he and Tina had been quarreling and he had been hallucinating and feared that he might harm her. The record indicates that it was believed that both had stopped taking their medication. Lloyd checked himself out of the hospital on September 10, 1985 against the doctor's advice and readmitted himself the following day, despondent over Tina's threats to leave him. He was officially released on September 27, 1985.
Lloyd was admitted to Laurel Wood Center on April 21, 1988, largely because "his spirits [were] making him think of killing people." He had been having extremely hostile feelings toward black people, and at sometime shortly before his admission, had bitten the ear of a black neighbor after a fight. He was discharged on June 10, 1988.

Tina
The record indicates that Tina used illegal drugs extensively as a teenager. Her mother admitted her to the Keesler Air Force Base Medical Center in 1978 because she was hallucinating. Her records indicate that she remained under treatment there between March 7 and July 26, 1978. Similar problems led to her admission to the Mississippi State Hospital at Whitfield in May, 1979, where she was hospitalized through August, 1979. She apparently had been arrested for disturbing the peace. In September, 1979, Tina received a gunshot wound in her chest. She testified that it was a suicide attempt, although her mother maintains that it could have been done by the man she was dating at the time. Following treatment for injuries to her heart and lung, her mother put her in "a private home in Texas" where she stayed for nine months.
Tina was again admitted to Whitfield in December, 1980, after she was arrested for grand larceny. She escaped from Whitfield in January, 1981, and hitchhiked to New Mexico. She was then readmitted to Whitfield in February, 1981, and remained there until March 30, 1981. Upon her first two admissions to Whitfield, Tina was diagnosed as schizophrenic, schizo-affective type; on her third admission, as schizophrenic, paranoid type, manic depressive, manic type.
At some point Tina's mother decided "that Whitfield wasn't really doing much for her except just keeping her locked up for thirty days and turning her loose, and it just wasn't solving anything." She was admitted to East Mississippi State Hospital by order of the Harrison County Chancery Court on February 16, 1983. While at EMSH, she gave birth to a son, who was adopted by her parents. She was released into the Hospital's Training Unit in September, 1983, shortly after the baby was born, and to the Respite Program, a half-way house in February, 1984. The record indicates that she was re-admitted to EMSH on October 11, 1985. Her mother testified that she attempted to commit suicide in April, 1986, by taking an overdose of her medication. She was admitted to Matty Hersee Hospital for treatment but the record does not indicate any further in-patient psychiatric treatment at that time.
In May, 1988, Tina was again admitted to EMSH because she was severely depressed. She was released on June 30, 1988.
At all times between hospitalizations, Tina has received out-patient psychiatric care and has been directed to take medication to control the manifestations of her illness.

PROCEDURAL HISTORY
A.M.G. was removed from her parents' custody by order of the Lauderdale County Youth Court in April, 1988 after the Lauderdale County Department of Human Services received a report of suspected neglect from a nurse at the Lauderdale County Health Department. Since that time, *381 A.M.G. has lived with her foster parents, with Human Services retaining legal custody.
On September 21, 1988, upon the direction of the Youth Court, Human Services filed a Petition to Terminate Parental Rights, pursuant to "The Termination of Rights of Unfit Parents Law," Miss. Code Ann. §§ 93-15-101  111 (Supp. 1992). Termination was sought specifically under § 93-15-103(3)(d)(i), which provides as follows:
The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:
Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which make the parent unable to assume minimally, acceptable care of the child;
Hearings were held in the Lauderdale County Chancery Court on March 14 and 20, 1990. Much of the evidence offered by Human Services included psychiatric records, and the depositions and testimony of a psychologist and a psychiatric nurse, both of whom recently had treated the child's parents. The Chancellor sustained the parents' objections to admission of this evidence pursuant to Miss.R.Evid. 503, which provides for a psychiatrist/psychologist-patient privilege, rendering such evidence inadmissible unless a party has filed pleadings, thus putting his mental condition at issue. The parents had filed no pleadings nor had they counter-claimed to regain custody of A.M.G.
The Chancellor therefore remanded the case to the trial docket and ordered Human Services to develop lay testimony about the parents' mental condition and their ability to care for A.M.G. A subsequent hearing was held on May 15, 1990. In his written opinion, the Chancellor partially granted the parents' motion to dismiss the petition, but retained jurisdiction over the case. He left legal custody of the child with Human Services and ordered a gradual return of the child to her parents. He declined to enter a final judgment until A.M.G. was returned to her parents on a full-time basis and a determination could properly be made of her parents' ability to care for her.
On May 29, 1990, Human Services filed a Motion for Stay of Judgment Pending Appeal, asserting that it was in A.M.G.'s best interests to keep her in her present foster care situation, rather than to move her in order to comply with the chancellor's orders to increase visitation and reintegrate her into her parents' home. On June 18, 1990, the chancellor overruled the motion.
Human Services appealed to this Court, which on August 8, 1990, granted the Motion to Expedite Appeal and also the Motion to Stay Pending Appeal pursuant to Miss.Sup.Ct.Rule 8, to the extent that "the increased visitation schedule ordered by the Chancellor is to be effected to the maximum extent possible while the child remains in her present foster home."
On January 16, 1992, the parents, Lloyd and Tina G., filed a Motion for Relief from Stay. They sought to have the child placed in a "neutral" foster home following allegations that Lloyd had sexually abused the child, charges that he asserts were instigated or encouraged by her foster parents.

LAW

I.
Rule 503(b), Miss.R.Evid., the Physician and Psychotherapist-Patient Privilege, provides that:
A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.
*382 Citing Rule 503, counsel for the parents objected during the hearings to the admission into evidence of testimony by Sarah Powell, a psychiatric nurse who had worked with the couple; the deposition of Dr. W.M. Woods, the psychiatrist at Weems Community Mental Health Center who was treating the couple on an out-patient basis at the time of the hearing; and the medical/psychiatric records of both Lloyd and Tina which were subpoenaed from the Weems Community Mental Health Center, Laurel Wood Center (formerly Meridian Regional Hospital), East Mississippi State Hospital, and the Mississippi State Hospital at Whitfield. The Chancellor sustained the objections, pursuant to Rule 503, stating that "I rule the same way, reluctantly, and I still believe in a case involving the best interest of the children, the medical records of anybody that has a bearing on the custody or welfare of children should be admissible." The excluded deposition and records were marked for identification as Exhibits 2-9 and were made a part of the record.
This Court has not directly addressed the question of whether an exception should be made to the Rule 503 privilege in a termination of parental rights proceedings. In State Board of Psychological Examiners v. Hosford, 508 So.2d 1049 (Miss. 1987), the Board found that Dr. Hosford had violated an ethics canon by divulging, in a custody proceeding, confidences of the parents regarding parenting skills gleaned from marital counseling sessions. In finding that the Board's narrow interpretation of its Principle 5 "clear danger" exception was not so arbitrary or unreasonable that the Court should intervene, we observed that:
It may be true that placement of temporary custody with the wrong parent may result in some emotional or psychological damage to the child. And, indeed, where that issue is presented to a Chancery Court and the issue and facts fully fleshed out, we are by no means prepared to say that the psychologist's lips will be forever sealed by the privilege (although we do not decide that point today as the matter is not before us).
Id. at 1056.
In other cases where we have considered admissibility of the testimony of a physician or psychologist when the welfare of a child was concerned, we have not addressed Rule 503. See In the Interest of T.T., 427 So.2d 1382 (Miss. 1983) (clinical psychologist's testimony regarding father's character disorder and psychopathic tendencies and mother's low I.Q. and vulnerability admissible in Youth Court termination hearing in interest of sexually abused child); Bryant v. State, 567 So.2d 234 (Miss. 1990) (physician's testimony and presentation of "grievously afflicted" child not prejudicial in case against father for child support).
Human Services asserts that absent the admission of expert testimony and medical records, the burden of "clear and convincing evidence" required in a termination of parental rights proceeding pursuant to Miss. Code Ann. § 93-15-109 (Supp. 1992) cannot be met. Further, it contends that it cannot, without expert testimony on the prognoses for Lloyd and Tina, meet the requirement of § 93-15-103(3)(d)(i) that the condition of the parent is unlikely to change within a reasonable time.
Human Services does not contend that the Chancellor erred in his interpretation or application of the Rule 503 privilege; rather, it contends that the privilege itself "completely thwarts the ability and the duty of the Chancellor to take into consideration all relevant information in order to determine the best interest of a minor child." Further, it seeks a reversal of the Chancellor's dismissal of the termination of parental rights proceedings and remand of the case for a full hearing admitting all relevant medical and psychiatric histories and prognoses of the parents.
Human Services has set forth a number of valid arguments advocating the creation of an exception to the Rule 503 privilege when the best interests of a minor child are involved, such as in the termination of parental rights proceeding brought pursuant to § 93-15-101, et seq. The United States *383 Supreme Court, in recent cases, has held that societal interest in the protection of minor children may outweigh a defendant's constitutional rights. In Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court held that the protection of child witnesses justifies an exception to the sixth amendment confrontation clause. See also Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (some abridgment of defendant's sixth amendment rights permissible in child abuse cases, but only after a specific finding of necessity and the presence of a compelling state interest); Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (if a child's out of court statements bear "particularized guarantees of trustworthiness," they can be used in child abuse cases without violating the sixth amendment confrontation clause); Baltimore City Department of Social Services v. Bouknight, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) (parent may not invoke fifth amendment privilege against self-incrimination in order to resist juvenile court order to produce child).
It further asserts that an increasing number of jurisdictions have, either by judicial decision or statute, created exceptions to the physician psychotherapist-patient privilege in child abuse and neglect cases, custody and termination of parental rights proceedings when the mental health of the parent could impact the welfare of the child. In particular, a number of jurisdictions have held that evidence of a parent's mental health is admissible in a termination proceeding, even when the parent has asserted the privilege. See In re M.M., 153 Vt. 102, 569 A.2d 463 (1989); Polk v. State Department of Human Resources, 542 So.2d 279 (Ala. Civ. App. 1988); Matter of Von Goyt, 461 So.2d 821 (Ala. Civ. App. 1984); Betty J.B. v. Division of Social Services, 460 A.2d 528 (Del.Supr. 1983).
Rule 503 has as its genesis the medical privilege statute, Miss. Code Ann. § 13-1-21. In relevant part, the statute provides that:
All communications made to a physician, osteopath, dentist, hospital nurse, pharmacist, podiatrist, optometrist or chiropractor by a patient under his charge or by one seeking professional advice are hereby declared to be privileged, and such party shall not be required to disclose the same in any legal proceeding except at the instance of the patient ...
Rule 503 was adopted in an era when a plaintiff seeking to invoke the privilege could preclude the testimony of a physician at trial merely by stating, "we do not waive the privilege." Rule 503 and its subparts, particularly subsections (e) and (f), is not a rule of procedure, rather it is a rule of evidence to be used in a hearing or at trial, and is limited to that extent.[1]
Although this Court has repeatedly stated that the protection of a child's welfare is of paramount concern, we find that there are several compelling arguments against the creation of an exception to the Rule 503 privilege in termination of parental rights proceedings. First, as the official comment to Rule 503 indicates, the privilege is founded on the public policy that people who need help should be encouraged to obtain it, rather than being deterred by the fear that the confidences divulged in consultation might be used against them. As we stated in Hosford, "[t]he subject matter of psychological counseling is often such that many in need of such services are not comfortable revealing the truth and may be coaxed into doing so only upon the most solemn assurance that what is said will never be revealed to anyone, ever, under any circumstances." 508 So.2d at 1055.
Second, if we were to create even the most narrowly-crafted exception to Rule 503, allowing for admission of medical or psychological records, diagnoses and prognoses of the parents in termination of parental rights proceedings pursuant to § 93-15-101, *384 et seq., it could open the floodgate for exceptions to this and other protective privileges when the welfare of a child is concerned. This would serve to effectively eviscerate the privilege and defeat the equally compelling societal interests it was intended to protect. The chancellor suggested as much in his opinion, stating:
This trial judge specifically believes an exception should exist in confidentiality of records in any case involving child custody, molestation, parental termination and so forth. I realize quite well that once the door is open, it is hard to close it. If we open the door in a termination proceeding, do we open the door in a custody proceeding? A modification proceeding? A child abuse proceeding? A criminal proceeding? The big question mark is, do we open the door when one child has abused another child? For instance, on a claim of the communication of a venereal disease, such as syphilis, from one child to another? Where do we close the door, or do we simply abolish Rule 503?
Finally, we are aware that creation of an exception to Rule 503 could exacerbate problems already faced by the mentally ill in making a knowing and intelligent waiver of their rights. As suggested in an amicus brief filed on behalf of the parents by the Mississippi Protection and Advocacy System, Inc., the policy of this Court to give a narrow reading to the exceptions to 503 "should respect the privacy of every individual, and particularly should not be overridden for those struggling under mentally handicapping conditions." Expressing concern for the validity of waiver forms signed by the couple, it is suggested that:
there is no showing in this record that a mentally handicapped person would have received the requisite disclosure of the Welfare Department's ability to shift from a fiduciary role to the role of adversary in the child custody proceeding here involved in order to make a waiver of privilege a knowing and intelligent one.
Creating an exception to the privilege would eliminate the need for the waiver, but leave the records of the seriously mentally handicapped even more vulnerable to exposure.
Accordingly, while we seek a resolution of this case consistent with the best interests of the child, we cannot obliterate the rights of the parents and thus decline to create an exception to Rule 503. Should the legislature determine that the privilege should be waived in termination of parental rights cases, it is their prerogative to make the necessary statutory changes.

II.
Lloyd and Tina contend variously that the testimony of Dr. Woods is inaccurate as well as cumulative to that given at the hearings; that expert evidence in this case would not be helpful to the trier of fact; and that there is no proof of "ongoing behavior" as required by § 93-15-103(3)(d)(i). We find, however, that expert testimony would not be cumulative and could be helpful to the trier of fact. Only with the assistance of expert testimony and opinion can the trier of fact reasonably determine whether the "chronic" nature of the illness places it within the ambit of "ongoing behavior" as specified in the statute, as well as the likelihood of any change in condition. For example, does the diagnostic term "remission" mean an absence of psychotic episodes or that the symptoms are under control because of proper medication or that all traces of the disease have disappeared? Further, expert testimony would be helpful in defining and explaining the nature of schizophrenia and the other disorders the parents suffer; its symptoms or manifestations; the treatment required on both an in-patient and an out-patient basis; medications prescribed and their side effects, as well as the ramifications of taking an improper dosage or failing to take it. Moreover, expert testimony could address the problems the illness causes in coping with every day problems, particularly those related to nurturing and raising a child, as well as the effects on the child of the parents' illnesses.
Such evidence may be obtained and admitted without resorting to the creation of *385 an exception to Rule 503. Miss.Rule Evid. Rule 702 provides that:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.
Further, pursuant to Miss.Rule Evid. 706, the court may, on its own motion, or by the motion of any party, appoint an expert witness to testify. Brown v. Cuccia, 576 So.2d 1265, 1267-68 (Miss. 1991). Thus, the chancellor or any of the parties may employ such expert witnesses as may be necessary to assist the trier of fact in determining whether Lloyd and Tina's parental rights should be terminated. See, e.g., Matter of Sheila S., 180 A.D.2d 687, 580 N.Y.S.2d 67 (1992). For example, the court might appoint as an expert witness a psychiatrist who specializes in schizophrenia and bi-polar disorders to testify regarding aspects of the symptomatology, prognosis and treatment of the disease. Likewise, the opinion of a psychologist or social worker who has worked with children raised by parents suffering from serious mental illness might be helpful to the trier of fact.
Any court-appointed expert is subject to the same rules of discovery which apply to other experts. Thus, any documentation sought must be obtained in accordance with M.R.C.P. 26. Further, under no subpart of Rule 503 is the opposing party given carte blanche to communicate ex parte with the appointed experts.

III.
In reviewing a termination of parental rights proceeding, this Court has applied the manifest error/substantial credible evidence test to the chancellor's findings of fact. Vance v. Lincoln Co. Dept. of Public Welfare, 582 So.2d 414 (Miss. 1991); Veselitis v. Cruthirds, 548 So.2d 1312, 1316 (Miss. 1989). The burden of proof is on the party seeking to terminate the parents' rights. In Interest of T.T., 427 So.2d 1382 (Miss. 1983). That party must prove by "clear and convincing evidence" that the parental rights should be terminated. Miss. Code Ann. § 93-15-109 (Supp. 1992); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Once that burden is met, the best interest of the child is the paramount consideration. Petit v. Hollifield, 443 So.2d 874, 877 (Miss. 1984).
Under Mississippi law, there is a presumption that the best interest of the child will be served by remaining in the custody of his natural parents. Matter of Marriage of Smith, 555 So.2d 73 (Miss. 1989); Keely v. Keely, 495 So.2d 452 (Miss. 1986); Rodgers v. Rodgers, 274 So.2d 671 (Miss. 1973). Furthermore, Miss. Code Ann. § 93-15-103(4) provides that:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the department of public welfare should be considered and alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
Although Human Services has not cited as error the chancellor's dismissal of the termination of parental rights proceeding, they have urged that the chancellor's decision should be reversed and the case remanded for a full hearing wherein all relevant evidence is admitted. We are reminded that the chancellor only partially dismissed the proceedings and retained jurisdiction over the case. Further, it has been more than two years since the proceedings were initiated. Accordingly, we remand the case to the chancery court for further proceedings consistent with this opinion in order to make a final determination of the parental rights question.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
*386 ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, and BANKS, JJ., concur.
PITTMAN, J., specially concurs, with separate opinion.
ROBERTS, J., not participating according to Supreme Court internal rules.
PITTMAN, Justice, specially concurring:
The majority fails to provide an exception to Rule 503(b) of the Mississippi Rules of Evidence in cases involving the termination of parental rights. Section 93-15-103(3) establishes the grounds for the termination of rights of unfit parents. Miss. Code Ann. § 93-15-103(3) (Supp. 1992). It provides, in pertinent part, the following:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
... .
(d) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child... .
Miss. Code Ann. § 93-15-103(3) (Supp. 1992).
As provided in § 93-15-103(3)(d)(i), the trial judge must consider the mental capacity of the parents. This Court has held on numerous occasions that the best interest of the child is paramount. Petition of Beggiani, 519 So.2d 1208, 1213 (Miss. 1988); Martin v. Putnam, 427 So.2d 1373, 1377 (Miss. 1983); Bloodworth v. Bloodworth, 409 So.2d 1336, 1337 (Miss. 1982). "Paramount" is defined as "supreme to all others." Webster's Third New International Dictionary 1638 (1971).
The majority's failure to provide an exception to Rule 503(b) prevents the trial judge from basing his opinion on all available facts. This implies that the welfare of a child in this State is considered to be less important than a parent's right to keep his medical records confidential. Thus, the best interest of the child is no longer the "paramount" concern.
There is a presumption that it is in the best interest of the child to remain in the custody of his natural parents. White v. Thompson, 569 So.2d 1181, 1183-84 (Miss. 1990); Milam v. Milam, 509 So.2d 864, 866 (Miss. 1987); Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss. 1973). This presumption coupled with Rule 503(b) enables a parent suffering from severe mental illness to maintain custody of a child. It is difficult to understand how a parent can claim that he has his child's best interest in mind and in the same breath invoke the privilege provided under Rule 503(b). The best interest of the child can only be served by providing the trial judge with all available information so he can make an informed and knowledgeable decision.
I understand the purpose of Rule 503(b) and the public policy arguments supporting the confidentiality of the psychotherapist-patient relationship. When the privilege provided by Rule 503(b) is weighed against the best interest of the child, however, the best interest of the child must remain the "paramount" concern. As noted by the majority, other jurisdictions have provided an exception to Rule 503(b). In re M.M., 153 Vt. 102, 105, 569 A.2d 463, 465 (1989), cert. denied, Magoon v. Young, 494 U.S. 1059, 110 S.Ct. 1532, 108 L.Ed.2d 771 (1990); Polk v. State Department of Human Resources, 542 So.2d 279, 280-81 (Ala. Civ. App. 1988); Matter of Von Goyt, 461 So.2d 821, 823 (Ala. Civ. App. 1984); Betty J.B. v. Division of Social Services, 460 A.2d 528, 531 (Del. 1983). The Court of Civil Appeals of Alabama held:
We recognize that the psychologist-patient privilege is an important one, not to be easily disregarded. We do not seek to discourage troubled parents from obtaining professional help. However, we are convinced that where the issue of the mental state of a party to a custody suit is clearly in controversy, and a proper resolution of the custody issue requires *387 disclosure of privileged medical records, the psychologist-patient privilege must yield.
Matter of Von Goyt, 461 So.2d at 823.
I am of the opinion that this Court should provide a similar exception to Rule 503(b). I would reverse and remand holding that the parents could not invoke the privilege provided by Rule 503(b).
NOTES
[1] Although it does not affect our ruling in this case, we note that Rule 503(f) was amended on October 13, 1992 to provide that waiver of the privilege by a party's placing of his physical, mental or emotional condition into issue by his pleadings does not authorize ex parte contact by the opposing party. The revised Comment to Rule 503 reiterates that subsection (f) is not a procedural rule, but governs admissibility of evidence at trial.