ISHEE, J.,
for the Court.
¶ 1. On November 14, 2005, the Lauder-dale County Youth Court entered a judgment terminating the parental rights of B.S.G.[1]. and D.C.D. pursuant to a petition filed by the appointed guardian ad litem, John E. Howell. Aggrieved by the judgment, B.S.G. appeals. She presents the following issues for this Court’s review:
I. (a) Whether alternatives to termination, such as durable legal custody, were considered by the youth court, (b) Wfliether the youth court erred by denying B.S.G.’s petition to proceed in forma pauperis and request for counsel, violating her due process rights.
II. Whether there was clear and convincing evidence to support the finding that there was a substantial erosion of her relationship with E.D. caused by drug abuse, prolonged and unreasonable absences, failure to communicate, and prolonged imprisonment, pursuant to 93 — 15—103(3)(f).
III. Was the determination that DHS made diligent efforts to return the child to the natural parents to no avail, pursuant to 93 — 15—103(3) (d) (i) and (ii), supported by clear and convincing evidence.
IV. Whether B.S.G’s imprisonment supports termination of her parental rights, pursuant to 93 — 15—103(e)(ii).
V. Was there sufficient evidence that B.S.G. had no contact with E.D. to support termination of parental rights, pursuant to 93 — 15—103(3)(b).
VI. Whether the court’s adjudication of neglect was supported by clear and convincing evidence.
VII. Whether the determination that reunification with B.S.G. was not in E.D.’s best interest, pursuant to 93-15 — 103(3)(h), was in error.
FACTS
¶ 2. The minor child, E.D., was born on November 10, 1998. On May 13, 1999, Riley Hospital personnel reported to Lauderdale County Department of Human Services (Human Services) that B.S.G. had attempted to “jerk her child out of the car seat with the car seat restraints still on her, to the point that the child was turning blue.” Hospital personnel further observed that B.S.G. appeared to be under the influence of drugs. The youth court granted emergency custody of E.D. with Human Services and ultimately granted relative placement with her maternal aunt, W.P. On June 15, 1999, the youth court entered a judgment of disposition, after an adjudication of neglect was entered on June 10, ordering legal custody of E.D. to remain with Human Services and physical custody to remain with W.P. The court further ordered that B.S.G. enter drug rehabilitation treatment and after-care, as well as submit to unannounced drug screens and any other terms decided by Human Services. The court ordered strictly supervised visitation between *262 B.S.G. and E.D. and stated the rights of the natural father, D.C.D., would be considered upon his release from prison. A review hearing was held on September 7, 1999, at which time the court placed full physical and legal custody of E.D. back with B.S.G., with Human Services to supervise the placement for a period of ninety days.
¶ 3. On June 30, 2003, Human Services petitioned the court for an adjudication of neglect, after discovering B.S.G. would leave E.D. with her maternal grandmother for extended periods of time. The grandmother complained that she was unable to care for E.D. for such extended periods. B.S.G.’s whereabouts were unknown and she was suspected of abusing drugs again. On July 1, 2003, the youth court held a shelter hearing and ordered temporary legal custody of E.D. with Human Services and physical custody with W.P. A hearing on the petition for adjudication of neglect was held on July 29, 2003, at which time the parties entered into an agreed resolution and the youth court entered a consent judgment. The court ordered the following: (1) the parties agreed there was a significant problem that needed to be addressed and submitted themselves to the jurisdiction and disposition of the youth court absent an adjudication of neglect or abuse, (2) custody of E.D. again be placed with Human Services for the placement of foster care and so that E.D. could receive medical treatment for any physical or mental problems she had at that time, (3) the parties agreed to fully cooperate with any recommended treatment programs or counseling by physicians, doctors, or psychologists, and (4) that visitation between the parties would be at the discretion of Human Services. The judgment stated that Human Services was to make reasonable efforts to reunite E.D. with B.S.G. On July 31, 2003, the youth court returned physical and legal custody to B.S.G., pending her completion of the service agreement with Human Services and after Human Services performed a home study.
¶ 4. On September 10, 2003, Lillie Cook, the Human Services designee, petitioned the youth court for a custody order and a formal adjudication of neglect, stating that “E.D. was in need of proper care and placement because B.S.G. had tested positive for cocaine.” The youth court ordered E.D. placed in the custody of Human Services for no longer than forty-eight hours, finding that Human Services had made reasonable efforts to maintain E.D. within her home but that the circumstances warranted her removal and that there was no reasonable alternative at that time. On September 11, the court held a shelter hearing and continued custody of E.D. with Human Services for a period not longer than thirty days. The court found that circumstances were of an emergency nature and no reasonable alternatives had been made to maintain E.D. within her own home nor were there any reasonable alternatives to custody at that time.
¶ 5. At the disposition hearing on October 7, 2003, B.S.G. did not contest the allegation of testing positive for cocaine. The youth court entered an order adjudicating neglect. The judgment stated that B.S.G. enter into a service agreement with Human Services, which included the following requirements: (1) attend Alcoholics Anonymous/Narcoties Anonymous meetings, (2) continue drug counseling, (3) maintain stable employment, (4) submit to unannounced drug screens, and (5) exercise supervised visitation.[2] Physical and *263 legal custody of E.D. was again placed with her maternal aunt, W.P. Human Services was ordered to monitor the placement of E.D. for ninety days. On January 6, 2004, the youth court ordered physical custody of E.D. returned to B.S.G., with legal custody to remain with Human Services, and set the matter for review on April 6, 2004.
¶ 6. However, on March 11, 2004, in a judgment of disposition, the youth court reinstated physical and legal custody of E.D. with W.P. Though there was no recording of the review hearing, the order stated the court heard testimony and sufficient evidence was presented for it to find that B.S.G. had relapsed on drugs.[3] B.S.G. was granted supervised visits with E.D. under the control of Human Services and the matter was set for review. On May 11, 2004, the youth court found the present legal and physical placement of E.D. with W.P. should continue and that the matter would be reviewed again in ninety days.[4]
¶ 7. On August 12, 2004, the youth court ordered custody of E.D. to remain under the current conditions in order to give B.S.G. sufficient time to complete the service agreement with Human Services. The youth court further ordered Human Services to begin working with B.S.G. on a graduated visitation schedule, in an effort to gradually work E.D. back into B.S.G.’s home.
¶ 8. On November 9, 2004, the youth court found physical and legal custody of E.D. was to remain with W.P. and, again ordered that B.S.G. have no contact with E.D. until future review by the youth court and upon B.S.G’s completion of the service agreement.[5] The youth court granted an additional six months to B.S.G. to complete her service agreement with Human Services.[6]
¶ 9. At the review hearing on February 10, 2005, the youth court held that physical and legal custody of E.D. would remain with W.P.; however, the court determined that B.S.G. had attempted to complete the items previously ordered by the court and further granted her limited, unsupervised visitation with E.D.
¶ 10. On April 19, 2005, upon review by the youth court, legal and physical custody of E.D. was held to remain the same. The court ordered joint counseling with E.D. and B.S.G. and that the records from same *264 be released for the court’s review.[7]
¶ 11. On June 7, 2005, the youth court reviewed the matter and found that custody of E.D. would remain as previously ordered. The court granted supervised visitation for D.C.D., on the condition that he submitted to a drug screen that day, as well as unannounced drug screens in the future.[8]
¶ 12. On July 19, 2005, the youth court ordered full custody of E.D. placed with her maternal uncle and his spouse, C.D. and D.D. The court stated that B.S.G. had a long history of drug and/or alcohol abuse and was presently incarcerated for the same. The court held that because E.D. had been in the custody of Human Services on several occasions, and with her current placement with Human Services lasting over one year, full custody to C.D. and D.D. was in E.D.’s best interest. On August 11, 2005, John E. Howell, the appointed guardian ad litem throughout the proceedings, filed a petition to terminate the parental rights of B.S.G. and D.C.D. The following grounds for termination were listed:
(1) A substantial erosion of the relationship between E.D. and her natural parents, which was caused by their abuse of drugs, prolonged and unreasonable absence, failure to communicate with E.D., and prolonged imprisonment pursuant to Mississippi Code Annotated section 93-15-103(3)(f).
(2) That B.S.G. and D.C.D. had made no contact with E.D., pursuant to section 93-15-103(3)(b).
(3) E.D. had been adjudicated neglected and custody had been removed from the parents for placement for foster care, pursuant to section 43-15-13, and the court had determined that reunification was not in E.D.’s best interest, pursuant to section 93 — 15—103(3)(h).
(4)Termination was in the best interest of E.D. so that a stable plan for her future could be established and so that E.D. would be eligible for adoption.
¶ 13. On November 8, 2005, the youth court held a hearing on the petition for termination of parental rights. B.S.G. and D.C.D. were both present and proceeded pro se. B.S.G. was in the custody of the Mississippi Department of Corrections at that time. At the start of the hearing, the court stated that the proceedings were civil, therefore, it could not appoint counsel for B.S.G.; however, both parents had the right to participate in the proceedings. The court also noted that the guardian ad litem had petitioned to terminate parental rights so that E.D. could be adopted and placed in a long-term stable environment.
¶ 14. Howell presented testimony from Lillie Cook, Human Services designee in this matter, the maternal aunt, W.P., and the spouse of the maternal uncle, D.D. Cook testified that in her opinion there had been a substantial erosion of E.D.’s relationship with her parents due to their persistent drug use and long-term absence from her life. She stated that E.D. had been in and out of Human Services custody and/or relative placement since 1999. Cook testified that D.C.D. sought visitation with E.D. sometime in 2004, and that visitation occurred maybe one or two times to her knowledge. She further testified that neither parent had ever paid any type of support while E.D. was in Human Services’s custody.
*265 ¶ 15. W.P. testified she had physical custody of E.D. in 1999 for a short period. In June 2003, W.P. had physical custody of E.D., based on an adjudication of neglect. She stated, “I had her from then and she’s gone back to B.[S.G.] a few times for a couple months; but each time, when they [Human Services] would drug test, here and there, a random test, they had to take her back.” She further testified, “but what she [B.S.G.] doesn’t see is the effect of what it’s doing to her after she [E.D.] sees that she’s ... being taken away from her Mama again, ... each time she thinks she’s got hope of being with her Mama and that everything’s gonna be okay ... and it’s not being that way.” W.P. also stated, in her opinion, it would be in E.D.’s best interest that she be eligible for adoption by someone that would love her and keep her in a stable home. When Howell asked if W.P. felt the relationship between E.D. and her parents had been substantially eroded, W.P. answered, “It’s been two and a half years that, you know, she’s not been with either one of them as far as being there to take care of her everyday, do the things that a parent ... has to do to raise a child.”
¶ 16. D.C.D. questioned W.P. on why she had “put E.D. off in somebody else’s home [C.D. and D.D.] after E.D. had been in W.P.’s custody for such a long time. W.P. responded that E.D.’s placement with her was never intended to be a permanent situation. She further stated, “B.S.G. was supposed to get clean and regain custody of E.D.; however, once B.S.G. was incarcerated a decision had to be made for the long term care of E.D.” She testified that the family decided it was best if she live with C.D. and D.D.
¶ 17. D.D. testified that E.D. was doing very well with the current custody arrangement and she and her two girls got along very well together. She stated that she and her husband were able to support E.D. and they were willing to sacrifice to take care of her and provide a loving, stable environment. She testified that D.C.D. had called E.D. during the time she had been in their custody, “several times and he’s talked to her several times on the phone,” however, she and her husband had cancelled a visit with him because they discovered he was arrested again. D.D. also testified that in her opinion there had been a substantial erosion of E.D.’s relationship with her parents.
¶ 18. B.S.G. testified that she was sentenced to eight years, with six years to serve. She stated that she had been able to get fifteen percent of her time taken off, and was presently taking a three-month parenting class, a six-month drug and alcohol class, and a three-month experiencing God class, which together would take off another 180 days. She also testified that she had worked in a FEMA warehouse after Hurricane Katrina and was able to get a little over nine months taken off her remaining time to serve. According to B.S.G.’s testimony on the day of the hearing, she would be eligible to be out of incarceration “toward the end of 2006.”[9] B.S.G. testified how much she loved E.D. and that she was aware of the confusion and disappointment she had caused E.D. She further stated that she did not want to cause anymore disappointment for E.D. She testified that she was making progress in her rehabilitation and that upon her release she would be able to provide a stable, loving home for E.D. B.S.G. said she was married and she had the support of her husband and mother-in-law to help her provide stability for E.D.
*266 ¶ 19. D.C.D. testified that he had been in prison until January 2005 and that he was, not financially stable to provide for E.D. He stated that he had offered to help with E.D. in any way that he was able but his help had been refused. He further stated he was glad E.D. had someone who could take care of her because he was not in a position to at that time. He testified that he did not have a problem with E.D. living with C.D. and D.D.
¶ 20. On November 14, 2005, the youth court entered a judgment terminating the parental rights of B.S.G. and D.C.D. The court found several of the grounds for termination of parental rights, pursuant to Mississippi Code Annotated section 93-15-103(3), had been satisfied. Specifically, the court determined the following:
(1) there was a substantial erosion in the relationship between E.D. and her natural parents caused by their drug abuse, prolonged and unreasonable absences, failure to communicate, and prolonged imprisonment; (2) Human Services had intervened on at least three prior occasions, giving B.S.G. the opportunity to regain custody to no avail; therefore, Human Services had made diligent efforts to develop and implement a plan for reunification; (3) B.S.G. was presently incarcerated for drugs and D.C.D. had just been released from an extended incarceration, and that both had failed to eliminate ongoing drug behavior, which prevented placement of E.D. with'either natural parent; (4) both natural parents made no contact with E.D. for an extended period of time due to incarceration; and (5) E.D. had been adjudicated neglected and custody had been removed from the natural parents, and the court determined reunification not to be in E.D.’s best interest.
The judgment stated that full legal and physical custody of E.D. was to continue with C.D. and D.D. The court also ordered that C.D. and D.D. have full authority and consent for relative adoption of E.D. Aggrieved by the youth court’s decision, B.S.G. appeals.
STANDARD OF REVIEW
¶ 21. In order to establish a case for termination of parental rights, the burden of proof is clear and convincing evidence. Miss.Code Ann. § 93-15-109 (Rev.2004). On appeal, however, the standard of review in termination of parental rights cases is limited. D.J.L. v. Bolivar County Dep’t of Human Servs., 824 So.2d 617, 620(¶ 10) (Miss.2002) (citing S.N.C. v. J.R.D., 755 So.2d 1077, 1080(¶7) (Miss. 2000)). This Court gives deference to the family court’s findings of fact; we will uphold the family court’s decision unless we determine that it is not supported by substantial, credible evidence. G.Q.A. v. Harrison County Dep’t of Human Servs., 771 So.2d 331, 335(¶ 14) (Miss.2000) (citing S.C.R. v. F.W.K., 748 So.2d 693, 700(¶40) (Miss.1999)). We must determine “not how we would have decided the case ab initio but whether there would be credible proof from which a rational trier of fact may have found as the court did in this case.” D.J.L., 824 So.2d at 620(¶ 10) (citing Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992)). “The entire record must be examined and that evidence which supports or reasonably tends to support the findings of fact made by the trial judge, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s findings of fact, must be accepted.” May v. Harrison County Dep’t of Human Servs., 883 So.2d 74, 77(¶ 10) (Miss.2004) (citing Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss.1987)). Once that burden is met, the paramount consideration is the best interest of the child. In re V.M.S., 938 So.2d 829, 832(¶ 6) (Miss.2006) (citing *267 Lauderdale County Dep’t of Human Servs. by Barnett v. T.H.G., 614 So.2d 377, 385 (Miss.1992)).
ISSUES AND ANALYSIS
II. Whether there was clear and convincing evidence to support the finding that there was a substantial erosion of her relationship with E.D. caused by drug abuse, prolonged and unreasonable absences, failure to communicate, and prolonged imprisonment, pursuant to 98 — 15—103(3)(f).
III. Was the determination that DHS made diligent efforts to return the child to the natural parents to no avail, pursuant to 93-15-103(3)(d)(i) and (ii), supported by clear and convincing evidence.
IV. Whether B.S.G’s imprisonment supports termination of her parental rights, pursuant to 93-15-103(e)(ii).
VI. Whether the court’s adjudication of neglect was supported by clear and convincing evidence.
VII. Whether the determination that reunification with B.S.G. was not in E.D.’s best interest, pursuant to 93 — 15—103(3)(h), was in error.
¶ 22. As these five issues are intertwined, in that each questions the youth court’s determination that there was sufficient evidence to find grounds for termination of parental rights, pursuant to Mississippi Code Annotated section 93-15-103 (Rev.2004), they will be discussed together.
¶ 23. When a child has been removed from the home of its natural parents and cannot be returned to the home within a reasonable length of time because returning to the home would be damaging to the child, or the parent is unable to care for the child, Mississippi Code Annotated section 93-15-103 (Rev.2004) provides in pertinent part the following grounds for termination of parental rights:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
[[Image here]]
(d) When the child has been in the care and custody of a licensed child caring agency or [DHS] for at least one (1) year; that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
[[Image here]]
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and the child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit *268 or communicate, or prolonged imprisonment; or
[[Image here]]
(h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the child’s parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
¶ 24. B.S.G. argues that if there is erosion of her relationship with E.D. then it is due to B.S.G. being prohibited from communicating with E.D., either by the trial court, W.P., or D.D. She states, “the only clear and convincing evidence of drug abuse is a positive urine screen in September of 2003 and April 2005, the arrest for possession in 2004, and her own admissions. ...” B.S.G. argues that the foregoing evidence did not directly cause erosion of her relationship with E.D. She argues that the testimony of her leaving E.D. for extended periods of time with E.D.’s grandmother is not the truth, stating that when she did not pick E.D. up on the day she was supposed to “I would call to make sure they were all right....” B.S.G. states, “the disease had me convinced that it would be okay to leave E.D. with my mother because E.D. was being taken care of....” B.S.G. argues her lack of communication with E.D. was due to attempts to communicate with her being denied by W.P. and/or D.D., not her unwillingness to communicate with E.D.
¶25. B.S.G. continuously argues that the testimony heard during the termination hearing were not true and were biased against her. She also continuously concedes that she did use drugs, that she did leave E.D. for extended periods with her mother, that she had contact with E.D., and that she is incarcerated. B.S.G., in the outset, argues that Howell did not sufficiently represent E.D.’s best interest, again stating that he presented no independent or impartial evidence. We find all of these arguments wholly without merit.
¶ 26. In M.J.S.H.S. v. Yalobusha County Dep’t of Human Servs., 782 So.2d 737, 741(¶ 14) (Miss.2001), the court held, regarding the requirements of the guardian ad litem, that one must be competent, provide representation without any adverse interest to the child, and must be fully informed of the his duties. M.J.S.H.S., 782 So.2d at 741(¶ 14) (citing S.N.C. v. J.R.D., 755 So.2d 1077, 1082(¶ 16) (Miss.2000)). The court stated the role of a guardian ad litem is to investigate, make recommendations to the court or enter reports, and act as a representative of the court, appointed to assist it in properly protecting the interests of an incompetent person. S.N.C., 755 So.2d at 1082(¶ 16). Howell did not bring the motion to terminate at the behest of the State and/or Human Services, rather, he brought the motion acting as the appointed guardian ad litem for E.D. and solely with the best interest of E.D. in mind. Furthermore, because Howell individually initiated the action, the court accepted his complaint as his recommendations to the court. We find that Howell adequately fulfilled the requirements as guardian ad litem for E.D. in matters before the youth court and, specifically, as to the termination of parental rights. Furthermore, although the guardian is required to perform his duties competently, there is no requirement that the court defer to his recommendations in its judgment. M.J.S.H.S., 782 So.2d at 741(¶ 18).
¶ 27. Additionally, we find the record provides adequate substantial evidence and that a rational trier of fact could have found that termination of parental rights was in E.D.’s best interest. B.S.G.’s arguments merely place blame for the reper *269 cussions of her life choices on the other persons involved, who have, consequently, maintained E.D.’s best interest throughout the past seven tumultuous years. Not only did B.S.G.’s mother, sister, brother, and sister-in-law give her every opportunity to get herself clean and in a position to properly care for E.D., but also both the youth court and Human Services extended every opportunity and resource its at disposal so that she could be reunited with E.D.
¶ 28. B.S.G. testified that she had been in trouble with the law prior to E.D.’s birth,[10] and unfortunately for E.D., a pattern of poor life choices continued. B.S.G. had E.D. taken out of her custody in 1999 by Human Services, although that adjudication of neglect was not enough to sober B.S.G., evidenced by similar incidents continuing to occur. The record indicates three petitions for adjudication of neglect directly related to B.S.G.’s drug abuse. E.D. was formally adjudicated neglected twice and one time the parties agreed to a consent judgment under the agreement that B.S.G. had a problem that must be addressed. Therefore, B.S.G.’s argument that the youth court’s adjudication of neglect is not supported by clear and convincing evidence is wholly without merit.
¶29. Furthermore, this Court is at a loss to understand how B.S.G. can claim that Human Services did not make diligent efforts to reunite her with E.D. According to the record, Human Services made numerous attempts to aid B.S.G. in regaining custody of E.D., consistently from March 2004 until July 2005. However, each time B.S.G. regained custody or visitation with E.D., B.S.G. would abuse drugs and/or leave E.D. for extended periods in the care of relatives, which ultimately placed the responsibility of E.D.’s best interest with the youth court. This cycle continued for over two years, essentially until B.S.G. was incarcerated.[11] Again, this argument is wholly without merit.
¶ 30. The record is replete with substantial, credible evidence that would lead a rational trier of fact to find the grounds for termination of parental rights discussed supra were satisfied with clear and convincing evidence. Furthermore, we find B.S.G.’s history of drug abuse, her inability to complete the court’s requirements to regain custody, coupled with her present incarceration and the testimony presented during the hearing, to support the court’s determination that reunification with B.S.G. was not in E.D.’s best interest. Additionally, there is little evidence to support B.S.G.’s assertions that she is capable of providing stability and long-term care for E.D. The paramount consideration for this Court is to determine what is in the best interest of E.D. In re V.M.S., 938 So.2d at 832(¶ 6). After a thorough review of the record, we find the evidence supports the youth court’s findings that termi *270 nation of parental rights was in E.D.’s best interest. Therefore, we find that issues II, III, IV, VI, and VII are without merit.
V. Was there sufficient evidence that B.S.G. had no contact with the E.D. to support termination of parental rights, pursuant to 93-15-103(3)(b).
¶ 31. Mississippi Code Annotated section 93-15-103(3)(b) (Rev.2004) states:
“(3) Grounds for termination of parental rights shall be based on ... (b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one year....”
¶ 32. While B.S.G. does not specifically argue that she had contact with E.D. at least one year prior to the termination hearing, we find that the record indicates there is not sufficient evidence to satisfy this ground for termination. According to the record, the youth court granted B.S.G. visitation with E.D. on February 10, 2005, and on April 19, 2005 the court ordered joint counseling with E.D., who was two days shy of seven years old at the time of the hearing.[12] The termination hearing was held on November 8, 2005. Therefore, at least nine months prior to the hearing B.S.G. presumably was in contact with E.D. This ground for termination is not satisfied in that E.D. was older than three years of age and B.S.G. presumably had contact with her within the statutory period of one year. While we agree that section 93—15—103(3)(b) is not an applicable ground for termination, we find that the youth court’s determination to terminate parental rights is sufficiently supported with the application of the other listed grounds. We further find this to be harmless error.
I. (a) Whether alternatives to termination, such as durable legal custody, were considered by the youth court.
¶ 33. B.S.G. argues the youth court erred by not considering alternatives to termination of parental rights, specifically, durable legal custody. We disagree.
¶ 34. In order for durable legal custody to be an option, Mississippi Code Annotated section 43-21-609 (Rev.2004) in pertinent part provides:
In neglect and abuse cases, the disposition order may include any of the following alternatives, giving precedence in the following sequence:
(a) Release the child without further action;
(b) Place the child in the custody of his parents, a relative or other person subject to any conditions and limitations as the court may prescribe. If the court finds that temporary relative placement, adoption, or foster care placement is inappropriate, unavailable or otherwise not in the best interest of the child, durable legal custody may be granted by the court to any person subject to any limitations and conditions the court may prescribe; such durable legal custody will not take effect unless the child or children have been in the physical custody of the proposed durable custodians for at least one (1) year under the supervision of [DHS].
¶ 35. The record is replete with review hearings held by the youth court in *271 an effort to make determinations as to what would be in the best interest for E.D. Durable legal custody could have been considered at any time during the disposition hearings, although the record does not indicate that it was a viable option before the court. On November 9, 2004, the court stated when it granted B.S.G. an additional six months to complete her service agreement with Human Services that the next step in the matter would be termination of parental rights. Furthermore, durable legal custody is not a mandatory option for the court and ultimately the paramount concern in determining proper disposition continues to be the best interest of the child, not reunification of the family. In re Petition of Beggiani, 519 So.2d 1208, 1213 (Miss.1988). This issue is without merit.
I. (b) Whether the youth court erred by denying B.S.G.’s petition to proceed in forma pauperis and request for counsel, violating her due process rights.
¶ 36. B.S.G. argues that her due process rights were violated when the youth court denied her petition for in for ma pauperis and her request for counsel. This issue is res judicata.
¶ 37. The youth court denied B.S.G.’s petition on the grounds that she had not followed proper procedure, specifically, proper notice had not been filed with the court. In her petition, B.S.G. asserted that she was indigent, however stated that she was “married to a stable business owner.” The youth court held, not only had B.S.G. not followed proper court procedure to perfect her petition but, also that her statements were contradictory, further supporting denial of the petition. Additionally, the record indicates on February 1, 2006, the Mississippi Supreme Court denied B.S.G.’s appeal of the youth court’s denial of her petition. The court held, “after due consideration of the pleadings and the United States Supreme Court’s decision in M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), the undersigned Justice finds that the Reply to Youth Courts denial of In Forma Pauperis Appeal should be denied.” The doctrine of res judicata, as stated in Miss. Dep’t of Human Servs. ex rel. Allen v. Sanford, 850 So.2d 86, 88(¶ 9) (Miss.2003), applies to this issue. Sanford, 850 So.2d at 88(¶ 9). We find the parties to be substantially identical, as well as the circumstances of the issue to be the same. Therefore, this issue is subsequently barred from our review.
¶ 38. THE JUDGMENT OF THE YOUTH COURT OF LAUDERDALE COUNTY TERMINATING PARENTAL RIGHTS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ„ CONCUR.

. Initials are used to protect the minor’s identity.

. The court's judgment stated that B.S.G. had never signed the previously ordered service agreement with Human Services and had only completed the two-week detoxification program toward rehabilitation for her drug abuse; therefore, B.S.G. was not even aware *263 of all that was required of her to regain custody of E.D.

. The record stated that Judge Coleman’s personal notes were the only recording of the dispositional hearing held on March 11, 2004, which indicated that B.S.G. was in a rehabilitation program at that time, evidencing her relapse on drugs.

. In the transcript of this hearing, Judge Coleman noted that E.D. was five years old at the time and "in need of stability without the failed promises of B.S.G.” He then ordered B.S.G. no visitation or contact with E.D. until the matter was reviewed again in ninety days, however, the actual order in the court record did not specifically state this.

. The court stated in its order that it was only granting this “last additional grace period for the mother because termination of parental rights is the only remaining step which this court has not pursued.”

. The court listed the following terms to be included in the service agreement: (1) B.S.G. was required to sign a release form from her Weems Mental Health Center counselor so that her counseling records were available for the court’s review, (2) obtain a drug and alcohol evaluation to determine if out-patient or inpatient treatment was needed, this evaluation should also be released to the court, (3) provide proof of employment and a stable home environment, and (4) submit to unannounced drug screens.

. At some point between the February 10 and April 19 review hearings, it appears from the record that B.S.G. retained Leigh Ann Key for legal representation.

. D.C.D. had apparently been incarcerated until sometime in early 2005.

. B.S.G. filed a reply brief on February 6, 2007 and was still incarcerated, however, in the reply brief she states she will be released in July [presumably, 2007].

. B.S.G. states in her brief that she was on house arrest in 2000 for an incident that occurred in 1997.

. On July 1, 2003, Human Services petitioned the youth court for an adjudication of neglect. On July 14, the parties agreed to a consent judgment and B.S.G. was ordered to enter into a service agreement with Human Services. On July 31, 2003, physical and legal custody was returned to B.S.G., however, on September 11, 2003, Human Services petitioned the youth court for an adjudication of neglect because B.S.G. had tested positive for cocaine. On October 7, 2003, physical and legal custody was granted to W.P., and while B.S.G. regained custody on January 1, 2004, by March 22, B.S.G. had relapsed. After March 22, 2004, the youth court and Human Services worked with B.S.G., granting her visitation and extending her additional time to complete her service agreement; however, sometime between June and July 2005 B.S.G. was incarcerated on a drug possession charge.

. While there is no specific evidence that B.S.G. did exercise her visitation rights and/or that she and E.D. attended joint counseling, there is also no evidence to refute the presumption that B.S.G. did have contact with E.D. at least seven months prior to the termination hearing.