# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00871-COA

**CONNIE RUTH DENHAM A/K/A CONNIE QUICK**                    APPELLANT

**v.**

**LAFAYETTE COUNTY DEPARTMENT OF CHILD PROTECTION SERVICES**                    APPELLEE

DATE OF JUDGMENT:        06/17/2021
TRIAL JUDGE:        HON. ROBERT Q. WHITWELL
COURT FROM WHICH APPEALED:        LAFAYETTE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        AMERY EWING MOORE
ATTORNEY FOR APPELLEE:        KURT STEVEN SAUL JR.
NATURE OF THE CASE:        CIVIL - CUSTODY
DISPOSITION:        AFFIRMED - 02/14/2023
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.    Connie Denham a/k/a Connie Quick (Connie) appeals from the Lafayette County Chancery Court's judgment terminating her parental rights. In her appeal, she claims that (1) there was not clear and convincing evidence to support the chancellor's ruling; (2) her counsel's ineffective assistance deprived her of due process; and (3) the chancellor erred in relying on the guardian ad litem's (GAL) findings because the GAL had not zealously investigated the case and because her report and testimony included inadmissible hearsay. We find no error and affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.    Connie is the natural mother of Donald,[1] a minor male child born in 2013 to her and her husband, David Quick (David).  In December 2017, an allegation of sexual abuse by the child's maternal grandfather was reported to the Lafayette County Department of Child Protection Services (LCDCPS).  While the allegation was unsubstantiated, the LCDCPS investigation did reveal incidences of domestic altercations occurring between the child's parents, which resulted in criminal charges being brought against David.

¶3.    Connie tested positive for methamphetamines in September 2018; so the child was taken from his parents' custody and sent to live with his maternal great-aunt, Floye Denham.  After Floye reported continual interference by Connie and the child's grandfather, the LCDCPS took Donald into custody by order of a Lafayette County Youth Court judge on October 17, 2018, and the child was placed in a foster home.  The youth court thereafter adjudicated Donald as neglected on November 15, 2018.  Service plans for reunification were implemented for both parents.

¶4.    On August 4, 2020, the LCDCPS filed a petition against Connie and David with the chancery court for termination of parental rights.  The petition asserted that both parents had "failed to substantially comply with the terms and conditions of the [service] plan and that reunification shall not be in the best interests of [Donald]."  Further, the petition noted that Connie was (1) "suffering from habitual alcoholism or other drug addiction and ha[d] failed to successfully complete alcohol and/or drug treatment as reasonably directed by the court" and that she was (2) "unwilling to provide reasonably necessary food, clothing, shelter, or

---

[1] A pseudonym is used to protect the minor's identity.

medical care," both of which constituted grounds for termination of her parental rights under Mississippi Code Annotated section 93-15-121(c)-(d) (Rev. 2018).[2]

¶5.     The LCDCPS filed a motion to appoint Angela Lenderman as the GAL on August 18, 2020.  The chancery court granted the motion, ordering that the GAL "shall investigate all material information regarding the Minor Petitioner and present an independent report and recommendation to this [c]ourt."  On November 18, 2020, the court appointed Jesse McRight to represent Connie as her counsel per Connie's request.[3]

¶6.     A hearing on the petition for termination of parental rights was held on June 16, 2021; both parents, represented by their respective appointed counsel, attended the hearing.  The following testimony was presented to the chancellor.

### *Jennifer Chandler*

¶7.     LCDCPS social worker Jennifer Chandler was the direct supervisor over the case. Chandler testified that in January 2018, an "in-home case was opened following inconclusive findings for sexual[-]abuse allegations on [Donald] with the perpetrator being the maternal grandfather, [Warren Doe]."[4]  During the LCDCPS's assessment, "major domestic violence

---

[2] Because David, who was incarcerated for domestic aggravated assault at the time of the proceedings, is not participating in this appeal, we have limited any references to the portions of the record pertaining to him unless relevant to the issues raised.

[3] Mississippi Code Annotated section 93-15-113(2)(b) (Rev. 2021) provides:  "If an indigent parent does not have counsel, the court shall determine whether the parent is entitled to appointed counsel under the Constitution of the United States, the Mississippi Constitution of 1890, or statutory law and, if so, appoint counsel for the parent[.]"

[4] Due to the nature of the unsubstantiated allegations against the child's grandfather, we will refer to him using a pseudonym.

concerns were revealed." Chandler said that, initially, the family was cooperative, and the agency attempted to work with them (e.g., referring Connie "to Families First to take needed classes such as healthy relationships, parenting, et cetera").

¶8.     Chandler noted that in September 2018, Connie was sent to Urgent Care for a drug screen, which "came back positive for methamphetamines." Connie claimed that it was a false positive due to medication, but lab personnel "stated that there were no medications that the mother was prescribed that would give a false positive for methamphetamines." Chandler testified that the minor child was sent to live with the child's great-aunt Floye in Ashland, Mississippi. That custody arrangement lasted only twenty-one days, however, because "there were constant calls by relatives stating that great-aunt was having problems taking care of the child because of interference with the grandfather, [Warren], and the mother." Floye told Chandler that Connie had threatened her. Chandler further noted that Warren "was outside the CPS office acting suicidal." Shortly afterward, the youth court adjudicated Donald as a neglected child.

¶9.     A family service plan was initiated for Connie, which she entered into voluntarily. Chandler testified that over the next three years, Connie failed to complete the following goals outlined in the plan:

> The counseling, the drug and alcohol assessment, recommendations of the drug and alcohol assessment, recommendations from the mental health assessment, cooperation with Child Protection Services, no physical or verbal altercations, resolve all legal issues, random drug screening.

Chandler also said that Connie's new live-in boyfriend was "a drug felon, and he has had several other charges." When Chandler and another social worker attempted to make a

4

surprise in-home visit one morning, Connie refused to let Chandler in her home. Connie only allowed someone from LCDCPS in her home once, on August 26, 2019. Chandler noted, "And at that time, the child had no bed. The room was not clean. There was paint all in the floor. She stated the carpet needed to be replaced. She had some things to do." She acknowledged that Connie had been participating in bi-monthly visitations with the child.

¶10.    Regarding the required drug screens ordered for Connie in the service plan, Chandler noted that Connie had tested positive for methamphetamines on September 20, 2018. However, as far as other tests/screens, Chandler testified:

> So January 29th, 2019, was a no show; March the 28th, 2019, no show; August the 2nd, 2019, no show; one that she went and done on her own on August the 15th of 2019, negative, but it says unobserved, not valid test, patient refused for a witnessed drug screen.
>
> . . . .
>
> September the 12th, 2019, positive for amphetamines and methamphetamines; January the 29th, 2020, no show; June 19th, 2020, no show; June the 19th, 2020, no show; August the 13th, 2020, no show; August the 17th of 2020, no show; October the 8th, 2020, no show; January 26th, 2021, was a no show; March 15th, 2021, mom refused the urine but did take the hair and she was positive for methamphetamines and amphetamines.

She stated that a no-show is considered to be "a fail."

¶11.    Chandler said that the child was with a foster family and that the "permanent plan for [Donald] is adoption." She noted that when the child came into LCDCPS custody at age five, he "had a severe speech development" issue. After being in foster care, he has received speech therapy and "has excelled beyond our wildest dreams."

¶12.    On cross-examination, Chandler clarified that the child's great-aunt said she could no

5

longer care for him because Connie was threatening her and because the child's grandfather "was coming to the home every day interfering with her parenting of [Donald.]" When asked if Connie had any outstanding legal issues, Chandler noted that Connie "has one contempt of court and she owes several thousands of dollars in fines." Regarding Connie's failure to submit to drug testing, Chandler said that "there was always an excuse" (e.g., did not have an I.D. or was out of town).

### Courtney McGonagill

¶13. Courtney McGonagill, a case worker for LCDCPS, testified that she had been working on this case since November 16, 2020. She had two family meetings with Connie to discuss the family service plan. McGonagill noted Connie's lack of cooperation with the drug and alcohol assessment. She also said that the mental-health assessment was not complete.

¶14. McGonagill attempted to perform a surprise home visit at approximately 9:45 a.m. on March 15 with Chandler. Connie's boyfriend had to go wake Connie up, and she refused to allow them inside the home. McGonagill observed that the exterior of the home contained "safety hazards" for the child, such as old, broken-down vehicles, a "burn pile," and "tires stacked everywhere." She also felt that the presence of the boyfriend, a felon, was a problem.

### Beverly Moorehead

¶15. Beverly Moorehead, an adoption specialist with the LCDCPS, testified that she had visited with the child on a monthly basis since September 2019. She opined that all Donald's needs were being met in his current placement and that she had "no concerns as far as the

6

adoptive placement there."

***Nicole Brunner***

¶16.    Nicole Brunner, Donald's foster parent, testified that the child had been in her care for two and one-half years.  Nicole said that Donald calls her "mother" and has indicated to her that he wished to remain in her home.  She said that the night before the hearing, he "slipped a note under [her] door that said I love you mom and was concerned about leaving after today."  When questioned by counsel why the child was "scared that he was going to be taken out of [her] home," Nicole replied, "Apparently there are some things being said from mom and grandpa during visits, that they have been talking to a judge and that they were going to get [Donald] to come back home, and he doesn't want to leave."  She said he had a "very good relationship" with her other adopted child and that Donald had "become a part of the family."  Nicole testified that Donald was "doing great" in school.

¶17.    On cross-examination, she noted that the child "rarely" talks about his natural family. Donald told Nicole that his father had kicked him and that he had "been locked in some closets."  With regard to Connie, "he really doesn't have a whole lot to say about her, just that that's his mom. . . . He doesn't ask to see her."  Nicole told the chancellor that the family attends a local Methodist church and that she and her husband own two businesses.

***Angela Lenderman***

¶18.    Lenderman, the GAL, read her written recommendation into the record, in which she stated that "it is in the best interest of the minor child that the parental rights of [Connie] and [David] be terminated and that the minor child remain in his current placement, which is in

7

the care of Jason and Nicole Brunner." Particularly, the GAL noted that Connie had "failed to complete her service plan," having had two positive drug tests for methamphetamines, "and then at least eight drug screens that she failed to show for." The GAL also stated that Connie had been arrested a few times since 2017, which was "a cause of concern." Donald told the GAL that his natural parents "argued a lot . . . and that the cops came to his house a lot."

¶19. On cross-examination, the GAL testified that Connie's March 15, 2021, drug screen results were "[p]ositive for methamphetamines and amphetamines." Connie told the GAL that "it was speed pills, specifically Apidex and Tenuate 75 that caused a false positive for her drug test." However, no documentation was provided to the GAL "that [Connie] did receive those pills." The GAL also noted that Connie's inmate records from the Lafayette County Sheriff's Office reflected arrests for simple assault, domestic violence, disturbing the peace, resisting arrest, felony shoplifting, possession of paraphernalia, and trespassing. When asked why she concluded Connie had deserted her son, the GAL replied:

> She's failed to cooperate with the service plan. She has not shown up or submitted to the random drug screens ordered by the agency. She has not maintained healthy relationships or also her arrest records, which have prevented her all of these things - - all of these things together have prevented her from being able to have a proper relationship with her child or to be reunified with him.

The GAL acknowledged that Donald said he would like to continue visiting with his mom and grandfather at the LCDCPS building, but he did not want to return to Connie's home. She also said that the last visit between Donald and Connie was "positive." The GAL opined, however, that a parent with a drug abuse problem "would be harmful for the child."

8

### Courtney Dixon

¶20. A warrant officer with the sheriff's department, Courtney Dixon, testified that he had been called more than once to address domestic disturbance calls between Connie and David. He did note, however, that the child was usually next door at the grandfather's home and did not appear to be in any danger.

### Floye Denham

¶21. Floye—Warren's sister, Connie's aunt, and Donald's great-aunt—said that the child lived with her when he was first removed from his home by the LCDCPS. She said it "went good" at first, but it was emotionally difficult for Donald because he wanted to go home. She admitted that Warren would come to visit the child "more than he [was] supposed to" because he and Donald "had such a bond."

¶22. Floye testified that her and Warren's other siblings were critical of her taking the child in, and her other brother had called the LCDCPS "and told them a whole bunch of things and everything"; so she was asked to bring the child back to Oxford. She claimed this interference from those family members hindered her from being able to continue to care for the child. Floye said that she now lives in a larger home and would be willing to take care of Donald. She told the chancery court that Warren took "good care of the child" and was "a good [C]hristian man." Floye testified that Connie had gone "through a period to where no, you know, she wasn't good at all, but she's gone a long way, . . . and she's doing great now."

### Warren Doe

¶23.    Warren, Donald's seventy-four-year-old grandfather, testified that he had raised Donald "from the time he was born until [LCD]CPS come got him."  He asserted that he could take care of the child.

### Connie Quick

¶24.    The natural mother, Connie, testified that she lived in a three-bedroom home with a female friend, Tina Randle.  She claimed that her home was "very clean" but admitted that the exterior of the house did contain "a bunch of scrap metal and stuff" that they had been trying to get rid of.  Connie said that Donald had stayed with her father at times, and they would go fishing.  She insisted that her father had never found drugs on her and that the child had "never been around or exposed to anything."  Connie said that she has a close bond with her child.

¶25.    Connie denied taking methamphetamines or being a drug addict.  She explained that she had been taking Apidex and Tenuate 75 (which she said was illegal in Mississippi) to lose weight.  Connie claimed that after she was informed Apidex caused her to "fail a drug test because it is speed," she quit taking the drug.  She testified that April Robbins, a nurse practitioner, had given her a prescription for the Apidex.  A letter from Robbins was submitted to the court, which stated Robbins had prescribed Apidex to Connie in 2008.  The attorney for the LCDCPS objected to the document, as it was not signed.  Connie's attorney explained that he had just received the letter that morning, and it was introduced merely to show Connie had a prescription.  Connie admitted to the chancellor that Robbins was her cousin. The court allowed the letter to be marked for identification purposes only but did not

10

allow it into evidence. Connie asserted that she had done everything that the LCDCPS had asked her to do. She denied that she had missed any drug tests. She also said that Donald told her that he wanted to come home with her.

¶26. Connie also denied that she or David had used drugs around the child. Connie did admit that the couple would occasionally "get into it but it would never be in front of the child." She said David was already incarcerated when Donald was taken into LCDCPS custody. Connie explained that she had not yet put the child in school because he had been in a wreck and was recovering. She admitted that he had "a little speech problem."

¶27. When asked about her boyfriend, Dean Edwards, she said that he was a good friend and lives on the property in a shed, but she denied that he lived in the home with her. She again denied that she had missed eight drug tests. Connie claimed she had negative test results from a different testing site than the one the LCDCPS used. These test results, however, were not admitted into evidence.

¶28. The chancellor inquired whether Connie had lost weight on the Apidex; she claimed that she lost almost 150 pounds. She told the chancellor that she was retired from the state and that she draws disability income for anxiety, for which she takes Alprazolam, Abilify, and Wellbutrin.

### David Quick

¶29. David denied that he was physically abusive to his family. He said he never spanked the child nor locked him in a closet. David denied any drug or alcohol use. He also averred that the family went to church every Sunday. David said that he did not doubt Connie's

11

ability to raise Donald. He claimed that the only reason for the domestic-disturbance calls to police was because they just had "[d]isagreements with one another." On cross-examination, David admitted that he was currently incarcerated for aggravated assault, and his probation had been revoked for a second count of aggravated assault. But he asserted that he "never touched [Connie], never" and that the child was "never around" during the arguments. David told the chancellor that he knew Connie had been taking medicine for weight loss but "didn't know anything about it."

### *Chancellor's Bench Opinion*

¶30.   The chancellor rendered his bench opinion, terminating the parental rights of Connie and David. With regard to Connie, the chancellor found:

> Connie was requested to -- she tested positive first, as I said, and then she failed to show for numerous other tests. I believe we said that there were eight tests testified to that she didn't show up for to take. She claims she went and got tests from other places that were -- in the meantime, most of them urine tests, but she brought no documents here today[,] and there's no documentation or proof that she's had any other tests other than the fact that she signed an application with Urgent Care saying that she received a hair follicle test on Monday of this week, which is not acceptable by the Court. The last test she had was March 20th, 2021. And she's tested positive each time, the first time and the last time that she's been tested for amphetamines and methamphetamines.

Thus, the chancellor found that in the three years since entering the service plan, Connie had failed to complete the agreed-upon assessments. He also noted that Connie's property—with "burn piles, tires, bottles, cans, scrap metal all around"—did not appear to "be a conducive place of where the child should be around or be placed back in that home." Regarding Connie's claim that the Apidex caused her falsely positive test, the chancellor did not think

12

Connie's testimony was "too credible in that regard and [did not] believe that that's what caused her situation." Rather, the chancellor concluded that Connie "has drug problems and she shouldn't have . . . custody or be involved with this child and that her rights should be terminated."

¶31. A final judgment was entered nunc pro tunc by the chancery court on June 17, 2021. Connie filed a notice of appeal from the judgment on July 8, 2021.[5]

## STANDARD OF REVIEW

¶32. Our review of a parental-rights termination decision is limited. *Smith v. Doe*, 314 So. 3d 154, 162 (¶26) (Miss. Ct. App. 2021). "The Court asks not how we would have decided the case ab initio but whether there is credible proof to support the chancellor's findings of fact by clear and convincing evidence." *Id.* The chancellor's findings of fact are reviewed "under the manifest error/substantial credible evidence test." *Id.* Thus, we "will not overturn a chancellor's findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." *Id.*

## DISCUSSION

### I. Whether there was clear and convincing evidence to support the chancellor's ruling.

¶33. "The burden of proof required to terminate parental rights is clear and convincing evidence." *Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1085 (¶21) (Miss. Ct. App. 2022) (citing Miss. Code Ann. § 93-15-115 (Rev. 2018)). This burden "is on the

---

[5] While there were additional post-trial motions and proceedings regarding Connie's request for indigent status on appeal, they are not relevant to our analysis, and neither party discusses these proceedings in the briefs.

13

party seeking to terminate the parents' rights." *N.E. v. L.H.*, 761 So. 2d 956, 961 (¶11) (Miss. Ct. App. 2000) (quoting *Lauderdale Cnty. Dep't. of Hum. Servs. v. T.H.G.*, 614 So. 2d 377, 385 (Miss. 1992)). Connie contends that the chancellor "erred in concluding that there was clear and convincing evidence necessary for terminating Connie's parental rights."

¶34. Connie complains on appeal that she was not given assistance "with complying with the service plan or toward reunification." Mississippi Code Annotated section 93-15-115 (Rev. 2021) provides in part:

> When reasonable efforts for reunification are required for a child who is in the custody of, or under the supervision of, the Department of Child Protection Services pursuant to youth court proceedings, the court hearing a petition under this chapter may terminate the parental rights of a parent if, after conducting an evidentiary hearing, the court finds by clear and convincing evidence that:
>
> . . . .
>
> (c) A permanency hearing, or a permanency review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that the Department of Child Protection Services, or a licensed child caring agency under its supervision, *has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child*[.]

(Emphasis added). The record clearly shows, however, that Connie was not cooperative in her dealings with the LCDCPS. The service plan for Connie stated she was to "comply with Random Drug Screens." Connie failed to take her required drug screens at the approved time and location. Documentation entered into evidence showed that Connie either was a "no

14

show" or refused the drug test at least eight times from 2019 through 2021. And as the chancellor noted in his bench ruling, Connie submitted "no documentation or proof that she's had any other tests other than the fact that she signed an application with Urgent Care saying that she received a hair follicle test on Monday of this week," which was "not acceptable."

¶35. Connie also claimed she had been on a diet pill (Apidex) that resulted in a false positive result for methamphetamines. Yet, the only evidence Connie submitted to support her claim was a letter from Connie's nurse practitioner (and cousin), Robbins, which simply stated that Connie had been under her medical care from 2008-2020 and that Connie had been prescribed Apidex. This letter was not dated or signed; nor did Robbins testify or submit a sworn affidavit as to her treatment of Connie. Additionally, Connie did not produce any of her medical records to support her testimony. For these reasons, the chancellor did not "think her testimony is too credible in that regard and doesn't believe that that's what caused her situation."

¶36. Both caseworkers testified that Connie refused to allow social workers to inspect her home numerous times, only allowing them to visit the home on one occasion in March 2021. Photographs of the home's exterior admitted into evidence showed scrap metal, old cars, and a burn pile in the yard, which the chancellor concluded was not "a conducive place of where a child should be around."

¶37. We find that the LCDCPS provided ample testimony and evidence regarding Connie's lack of cooperation and failure to comply with the service-plan requirements, demonstrating that she was "unwilling to provide necessary food, clothing, shelter, or medical care for the

15

child." As such, we conclude the chancellor's ruling was supported by substantial credible evidence that was clear and convincing.

## II. Whether Connie's appointed counsel rendered ineffective assistance, depriving her of due process.

¶38. Connie asserts that her appointed counsel's failure to subpoena her prescription records and to object to certain prejudicial and/or hearsay testimony denied her constitutional right to due process. "The United States Supreme Court has unequivocally recognized that parental rights are a matter of fundamental constitutional significance." *G.Q.A. v. Harrison Cnty. Dep't of Hum. Res.*, 771 So. 2d 331, 335 (¶16) (Miss. 2000) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). "If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." *Santosky*, 455 U.S. at 753.

¶39. Mississippi courts have not addressed whether the Sixth Amendment's right to effective assistance of counsel extends to proceedings involving the termination of parental rights. But in *Miller v. Smith*, 229 So. 3d 100, 105 (¶22) (Miss. 2017), the Mississippi Supreme Court expressly held that the Sixth Amendment, which by its own terms "limits its own application to 'criminal prosecution,' does not apply to civil proceedings."[6] *See also DeMyers v. DeMyers*, 742 So. 2d 1157, 1162 (¶20) (Miss. 1999) ("[T]he constitutional right to effective assistance of counsel does not apply to a civil proceeding."). This Court has further clarified that "[t]he Sixth Amendment right to effective assistance of counsel is triggered in criminal proceedings, *not family-law matters*." *Adams v. Rice*, 249 So. 3d 463,

---

[6] *Miller* involved a Confrontation Clause argument. *Miller*, 229 So. 3d at 105 (¶20).

16

472 (¶35) (Miss. Ct. App. 2018) (emphasis added) (dealing with a child-custody issue).

Additionally, although Connie has cited caselaw from criminal proceedings and cases involving termination of parental rights addressing other issues, she has not cited relevant legal authority that addresses this specific question before us.

¶40. We note that some jurisdictions have chosen to apply the well-established *Strickland* standard[7] used in criminal proceedings to cases involving the termination of parental rights, requiring a finding of deficient performance and resulting prejudice. *See In re A.P.-M.*, 110 N.E.3d 1126, 1132 (¶39) (Ill. App. Ct. 2018) ("apply[ing] the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel appointed under the Juvenile Court Act" in a termination-of-parental-rights case); *In re M.P.*, 126 A.3d 718, 726 (Me. 2015) (finding "the deprivation of parental rights is in many ways similar to the deprivation of liberty interests at stake in criminal cases"); *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (finding "no reason not to apply [*Strickland*] in our civil parental-rights termination proceedings").[8]

---

[7] In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the United States Supreme Court held that in order to establish a successful claim of ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."

[8] An even smaller number of jurisdictions have adopted a "fundamental fairness" test in determining ineffective assistance in these types of cases. *See, e.g.*, *In re Geist*, 796 P.2d 1193, 1204 (Or. 1990) (A parent "must show, not only that her trial counsel was inadequate, but also that any inadequacy prejudiced her cause to the extent that she was denied a fair trial and, therefore, that the justice of the circuit court's decision is called into serious question."); *see also People in Interest of RGB*, 229 P.3d 1066, 1090 (Haw. 2010) (holding that the proper inquiry is "whether the proceedings were fundamentally unfair as a result of counsel's incompetence"); *Baker v. Marion Cnty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004) ("[W]e deem the focus of the inquiry to be whether it appears that

¶41.   However, in *Chasez v. Chasez*, 957 So. 2d 1031, 1038 (¶21) (Miss. Ct. App. 2007), this Court "found no case law that would require counsel in a civil[-]contempt [case] to meet the familiar [*Strickland*] standard for ineffective assistance of counsel, i.e., whether counsel's performance was deficient and that this deficiency prejudiced his defense." Likewise, we have found no caselaw to support such a finding.

¶42.   Moreover, assuming that the *Strickland* standard is applicable, Connie has not demonstrated that she suffered any prejudice or that she received a fundamentally unfair trial as a result of her counsel's performance. Regarding counsel's "failure" to subpoena her medical records, it is questionable whether Connie was forthcoming with her attorney regarding the medical records or documentation she claims he should have requested—information that Connie herself could have obtained. The one item she did provide—the letter from her nurse practitioner/cousin—was not given to counsel until the morning of the termination hearing.

¶43.   Connie contends her counsel should have objected to Chandler's testimony that Warren "was suicidal" because it was "highly inflammatory." To clarify, Chandler testified that Warren was "acting suicidal" outside the department's office. Connie also cites counsel's failure to object to witnesses' testimony that her "new boyfriend was a convicted felon when no substantiating documentation was entered into evidence." This testimony was

_____

the parents received a fundamentally fair trial whose facts demonstrate an accurate determination."); *but see In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016) (holding that a parent's due process entitlement to fundamentally fair procedures in parental-rights-termination proceedings does not require that the parent be allowed to attack collaterally an order terminating parental rights based on ineffective assistance of counsel).

not so inflammatory or prejudicial as to affect the fundamental fairness of the hearing, especially because the chancellor's ruling was based on Connie's failure to complete her service plan.

¶44. Connie also avers that Brunner's testimony that the child was "scared" of her was hearsay. However, Brunner merely stated that the child had left her a note indicating that he was "very concerned" about having to leave Brunner's house when the hearing was over. It was counsel for the LCDCPS that asked Brunner if the child was "scared he was going to be taken out of [the] home." Brunner's reply was only that it was apparent that Connie and Warren had been telling the child that he was going back home with them. *See supra* at ¶16. Thus, we find counsel's failure to object to this testimony was not prejudicial.

¶45. Lastly, Connie says her counsel failed to object to the GAL's "hearsay testimony," "particularly as to the child's statements as to adoption and placement." Specifically, the GAL testified, "[H]e told me that he wants to be adopted by the Brunners." We agree with the appellee that "[t]here is simply no basis for a claim of substantial harm or error" regarding any failure to object to this testimony. This testimony was contained in the GAL's written report and was corroborated by Brunner's testimony. In addition, to reiterate, it was apparent that the chancellor based his ruling on Connie's failure to comply with her service-plan requirements, not the child's preference.

¶46. Recognizing the supreme court's holding that the right to effective assistance of counsel does not apply in civil proceedings, *Goodin v. Dep't of Hum. Servs.*, 772 So. 2d 1051, 1055 (¶12) (Miss. 2000), we find no reversible error regarding this issue.

19

**III. Whether the chancellor erred in relying on the GAL's findings because the GAL had not zealously investigated the case and because her report and testimony included hearsay, which Connie contends was inadmissible, as the GAL had not been designated as an expert.**

¶47. Connie contends that the GAL's "investigation offered at trial did not evidence zealous advocacy as required" by law. She further claims the GAL "used hearsay to support her findings that Connie's rights should be terminated due to drug addiction" and that the chancellor's reliance on this testimony was error.

¶48. The supreme court has recognized that GALs "do not have an option to perform or not perform, rather they have an affirmative duty to zealously represent the child's best interest." *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Hum. Servs. ex rel. McDaniel*, 782 So. 2d 737, 740 (¶14) (Miss. 2001). We find that the GAL, in this instance, did so. The GAL's report indicates that she interviewed both the LCDCPS caseworkers, the natural parents, the foster parents, and the minor child. She also reviewed LCDCPS documentation, as well as the court's files.

¶49. The GAL's report also notes that on one occasion, when the GAL attempted to observe a visit between Connie and Donald, Connie became "argumentative and defensive as to [the GAL's] presence in the room." On another occasion, Connie did not show up for the visit. As this Court noted in *R.L. v. G.F.*, 973 So. 2d 322, 325 (¶12) (Miss. Ct. App. 2008), "it is difficult to find merit in [a parent's] argument that the [GAL] failed to adequately perform her obligations when [he or she] did not avail himself of the supplemental opportunities to meet with [the GAL]." Connie has not demonstrated to this

Court that the GAL did not act in the best interests of the child, and we find no merit to her argument.

¶50. Regarding Connie's claims that the GAL "used hearsay to support her findings," Connie's attorney did not raise a contemporaneous objection to this alleged hearsay. Therefore, the chancellor did not have an opportunity to rule on the testimony's admissibility. "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985). Thus, this argument is waived from consideration on appeal.

¶51. Notwithstanding the waiver, we find no merit to this issue. In *Ballard v. Ballard*, 255 So. 3d 126, 133 (¶19) (Miss. 2017), the supreme court admittedly recognized that "especially when a chancellor departs from the recommendation of the [GAL], . . . the result reached by the chancellor must be supported by admissible, competent evidence rather than hearsay." However, in *Stewart v. Stewart*, 309 So. 3d 44, 78 (¶¶107-09) (Miss. Ct. App. 2020), we upheld the chancellor's determination, as "nearly all the other witnesses the GAL interviewed also testified at trial . . . and were subject to cross-examination by both parties[.]" In addition, documentation reviewed by the GAL was submitted into evidence. *Id*. at 79 (¶109). Likewise, in this instance, there was ample documentation admitted into evidence regarding Connie's ongoing failure to cooperate and comply with the service plan for reunification. Furthermore, the chancellor did not "depart" from the GAL's recommendation in this instance.

¶52. Connie also asserts that any reliance on the GAL's "hearsay" testimony was error

because she was not designated as an expert. To support her argument, she cites authority from a specially concurring opinion by Presiding Justice Dickinson in *McDonald v. McDonald*, 39 So. 3d 868, 887 (¶68) (Miss. 2010) (Dickinson, P.J., specially concurring), stating "that guardians ad litem—properly appointed under Rule 706 and qualified as experts under Rule 702—may rely on hearsay in reaching their opinions[; b]ut hearsay used to support an expert's opinion is quite different from hearsay admitted as substantive evidence." Admittedly, the chancery court's order appointing Lenderman as the GAL did not designate her as an expert; the court simply stated that she was to "investigate all material information regarding the Minor Petitioner and present an independent report and recommendation to this [c]ourt." We find this language in the order comports with the relevant statute, Mississippi Code Annotated section 43-21-121(3) (Rev. 2021), which provides:

> In addition to all other duties required by law, a guardian ad litem shall have the duty to protect the interest of a child for whom he has been appointed guardian ad litem. The guardian ad litem *shall investigate, make recommendations to the court or enter reports as necessary to hold paramount the child's best interest*. The guardian ad litem is not an adversary party and the court shall ensure that guardians ad litem perform their duties properly and in the best interest of their wards. The guardian ad litem shall be a competent person who has no adverse interest to the minor. The court shall ensure that the guardian ad litem is adequately instructed on the proper performance of his duties.

(Emphasis added). Moreover, the supreme court has held that "[c]hancellors should be free to assign duties to a guardian ad litem as the needs of a particular case dictate[.]" *S.G. v. D.C.*, 13 So. 3d 269, 281 (¶49) (Miss. 2009). And as discussed, the GAL's report and testimony were supported by ample evidence. For these reasons, we find Connie's claims of error with regard to the GAL's report and testimony are not supported by the record.

22

# CONCLUSION

¶53. Finding that the chancellor's ruling was based on substantial credible evidence and that there is no merit to Connie's assignments of error regarding counsel's performance or the GAL's report and testimony, we affirm the judgment.

¶54. **AFFIRMED.**

**WILSON, P.J., McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J. GREENLEE, J., NOT PARTICIPATING.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶55. There is a fundamental liberty interest in preserving parental rights—in a family staying together. Six years ago, the Legislature decided this liberty interest was so crucial that before termination of parental rights, a mother or father could be appointed a lawyer if they were indigent.

¶56. The majority concludes an indigent parent who is appointed counsel is somehow not entitled to that lawyer being reasonably effective. Because *any* appointed lawyer owes the client a duty of reasonably effective assistance, I respectfully dissent in part.

¶57. "In 2016, the Mississippi Legislature enacted the Mississippi Termination of Parental Rights Law." *Miss. Dep't of Child Prot. Servs. v. Bynum*, 305 So. 3d 1158, 1161 (¶4) (Miss. 2020). The law governs the conduct of the hearing for the termination of parental rights. It requires at the outset for a trial court to "explain to the parent . . . [t]he right to counsel," among several other rights. Miss. Code Ann. § 93-15-113(2)(a).

23

¶58.   Next, "[t]he court shall then determine whether the parent before the court is represented by counsel." Miss. Code Ann. § 93-15-113(2)(b).  "If an indigent parent does not have counsel, the court shall determine whether the parent is entitled to appointed counsel under the Constitution of the United States, the Mississippi Constitution of 1890, or statutory law and, if so, appoint counsel for the parent and then continue the hearing for a reasonable time to allow the parent to consult with the appointed counsel." *Id.*

¶59.   This law directly addresses one of the most important rights in our society.  "The liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  And "[i]n Mississippi . . . there exists a strong presumption in favor of preserving parental rights." *In re A.M.A.*, 986 So. 2d 999, 1009 (¶22) (Miss. Ct. App. 2007).

¶60.   In construing the appointment law, the Supreme Court noted that "[t]he statute *mandates* the court consider whether a parent has counsel and requires appointment of counsel if the court determines the indigent parent is legally entitled to counsel." *Bynum*, 305 So. 3d at 1161 (¶4).  In light of the reality that this is a mandatory duty, there is simply no way that this right to counsel is not accompanied by a corresponding requirement of reasonably effective assistance.

¶61.   For decades, the United States Supreme Court has expressly recognized in criminal cases "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Yet even then, the Court

24

determined it had "indirectly recognized" this standard since 1970. *See McMann v. Richardson*, 397 U.S. 759, 770 (1970) (evaluating a guilty plea in light of the efforts of "a reasonably competent attorney"). This near-universal standard is well understood by trial and appellate courts and carries with it nearly forty years of jurisprudence.

¶62. *Strickland* explained that when a lawyer is appointed, this "entails certain basic duties." *Strickland*, 466 U.S. at 687. "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Id*. "From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id*. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id*.

¶63. And while that case was applying the Sixth Amendment, it perfectly captured the importance of why effective counsel is so vital: "because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id*. at 685. The lawyer's role is "to ensure that the trial is fair." *Id*.

¶64. A hearing to terminate parental rights places a parent in combat against the State, which generally possesses superior resources. At stake is not personal freedom or money damages, but the very right to continue as a parent—to have a child. This is one of the most extreme legal situations a Mississippian could ever encounter, and the Legislature was right

to assure that a parent, if indigent, could be appointed counsel.[9] So it is absolutely crucial that this appointed lawyer be reasonably effective when so much is at stake—when indeed, a family hangs in the balance. This fulfills our lofty purpose of "ensur[ing] that the trial is fair." *Id*.

¶65.    As the TPR appointment statute was not enacted until 2016, it does not matter that our Supreme Court "has held that the rights to appointed counsel and to effective assistance of counsel do not apply in civil proceedings." *Goodin v. Dep't of Hum. Servs.*, 772 So. 2d 1051, 1055 (¶12) (Miss. 2000). That case was decided many years before this law, and in any event was not about the deprivation of a fundamental liberty interest, as here, but about enforcement of a child support order. *Id.* at 1053 (¶1).

¶66.    It also does not matter that our Court's jurisprudence has held that "[t]he Sixth Amendment right to effective assistance of counsel is triggered in criminal proceedings, not family-law matters." *Adams v. Rice*, 249 So. 3d 463, 472 (¶35) (Miss. Ct. App. 2018). The Sixth Amendment has nothing to do with it since the origin of the appointment of counsel in this case is pursuant to state law, and the lawyer in *Goodin* wasn't appointed but retained. *Id*. at 472 n.15 (revealing the appellant in that case "hired and fired several attorneys or represented herself").

¶67.    As established above, our precedent recognizes and protects the right of parents to the "care, custody, and control" of their children. *Troxel*, 530 U.S. at 65. In this case, Connie

---

[9] Indeed, in *Bynum*, the Court pointed out how it had recognized the authority of trial courts to appoint counsel for indigent parents going back to 2000. *Bynum*, 305 So. 3d at 1161 n.2.

Denham was facing the total loss of her parental rights—not a mere change in custody or a fight over how much child support was owed. Because her fundamental liberty right was at stake, she was entitled to reasonably effective counsel once a lawyer was appointed. This mother should not be owed less of a duty than if a lawyer had been appointed to her in a criminal case. In line with the very essence of *Strickland*, when a fundamental liberty interest is at stake, we must ensure a citizen receives reasonably effective counsel.

¶68. I agree with the majority that there was evidence to support the trial court's ruling, but I cannot agree there is no duty of effective counsel in cases where a parent faces the termination of rights to their child.

**WESTBROOKS, J., JOINS THIS OPINION.**